

06/20/2008

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### BEAUMONT DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **ELECTRO-MOTOR, INC.** | § | Case No. 08-10221 |
| xx-xxx8934 | § | |
| 465 S. Main St., Vidor, TX 77662 | § | |
| | § | |
| | § | |
| Debtor | § | Chapter 11 |

| | | |
|---|---|---|
| ELECTRO-MOTOR, INC. | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Adversary No. 08-1065 |
| | § | |
| INDUSTRIAL APPARATUS | § | |
| SERVICES, INC.; INDUSTRIAL | § | |
| APPARATUS SERVICES, LTD., and | § | |
| KENNETH W. WELBORN | § | |
| | § | |
| Defendants | § | |

## MEMORANDUM OF DECISION

This adversary proceeding is before the Court to consider the request of the

Plaintiff, Electro-Motor, Inc. ("EMI"), for the entry of a preliminary injunction against

one of the Defendants, Kenneth W. Welborn ("Welborn"),[1] as a means to enforce a

covenant not to disclose confidential information and a covenant not to compete executed

by Welborn during the period of his employment.  The Court conducted an evidentiary

hearing on the Plaintiff's request for preliminary injunction on May 30, 2008.  At the

---

[1] An agreed preliminary injunction was entered as to the IAS Defendants on May 27, 2008.

conclusion of the hearing, the Court took the matter under advisement.  This

memorandum of decision disposes of all issues pending before the Court.[2]

## Background

Defendant, Kenneth W. Welborn, was employed by the Plaintiff, Electro-Motor,

Inc. for approximately 35 years until he voluntarily resigned on April 23, 2008.  EMI is a

family enterprise started in the 1970's by his uncle, James Welborn, that engages in an

electric motor repair business primarily serving the needs of industrial companies such as

pipelines, refineries, chemical plants, and affiliated ventures.  The Defendant learned the

details of the business from the "bottom up" throughout his years with the company.  He

eventually became the general manager for EMI with primary responsibility for all

aspects of customer relations, including customer procurement, development of contract

bids, establishment of pricing regimens, development of repair procedures, actual motor

testing, and insuring that specific processes requested by certain customers were fulfilled.

Welborn assumed many of those responsibilities from a position formerly held by

his brother, David Welborn, who left the company in 1998-99 to work for a competing

firm in the area, Industrial Apparatus Services, Inc. ("IAS").  Because EMI management

believed that David Welborn had used inside, proprietary information to benefit his new

company to the competitive disadvantage of EMI, Welborn, as a key employee, was

---

[2]  This Court has jurisdiction to consider the complaint pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157(a).  The Court has the authority to enter a final judgment in this adversary proceeding since it constitutes a core proceeding as contemplated by 28 U.S.C. §157(b)(2)(A), (E), and (O).

required to sign a "Confidentiality, Non-Competition and Non-Solicitation Agreement" in September 2002.[3]

With regard to the use of EMI's confidential information, the agreement provided as follows:

> 2.    **Confidentiality.**  The Employee acknowledges that (i) during his or her employment with the Employer, he or she will be disclosed or will acquire Confidential Information;[4] (ii) the Employer has and will continue to enter into agreements with clients and others whereby the Employer agrees to maintain the confidentiality of certain information, (iii) disclosure of Confidential Information to others with be highly detrimental to both the interests of the Employer and its clients; and (iv) Confidential Information is the property of the Employer and/or its clients, business partners of

---

[3]  Ex.  P-1.

[4]  The agreement provided that:

(b)    "**Confidential Information**" means information in any form, not generally known to the public, disclosed to or acquired by the Employee directly or indirectly from the Employer or any clients, business partners or affiliates of the Employer during the term of the Employee's employment with the Employer, including, without limitation

> (i)    information relating to the research, developments, systems, operations, clients and business activities of the Employer or its business partners or Affiliates,

> (ii)    information received from any clients, business partners or Affiliates of the Employer,

> (iii)    information specifically designated by the Employer as confidential,

> (iv)    information specifically designated by a client, business partner or Affiliate of the Employer as confidential, and

> (v)    information required to be maintained in confidence by the Employer pursuant to an agreement with a client, business partner, associate or other person,

(c)    but shall not include any information which was known to the Employee prior to the date of the Employee's employment with the Employer or which was publicly disclosed otherwise than by breach of this Agreement.

Affiliates, as the case may be.  Accordingly, the Employee agrees that:

(a)    the Employee will not, at any time, disclose any Confidential Information to any other person not an employee of the Employer, nor will the Employee use Confidential Information for any purpose other than required by his or her employment, and

(b)    the Employee will not, at any time, or in any way, take or reproduce Confidential Information unless required by his or her employment.  The Employee will, upon ceasing to be employed by the Employer, return to the Employer all Confidential Information in his or her possession or under his or her control whether such Confidential Information belongs to the Employer or otherwise.  The Employee will also return all property then in his or her possession or under his or her control which belongs to the Employer or its Affiliates.

The agreement further provided that Welborn would not compete with EMI within a

designated geographic area and would forego any recruitment of EMI's customers or

employees pursuant to the following terms:

3.    **Non-Competition and Non-Solicitation.** The Employee acknowledges that he or she will acquire considerable knowledge about, and expertise in, certain areas of the Employer's business and that he or she will have knowledge of, and contact with, customers and suppliers of the Employer or its Affiliates (as hereafter defined). The Employee further acknowledges that he or she may well be able to utilize such knowledge and expertise, following termination of his or her service with the Employer, to the serious detriment of the Employer in the event that the Employee should solicit business from customers of the Employer or its affiliates.  Accordingly, the Employee agrees that:

(a)    **Non-Competition**  During his or her employment and for a period of three (3) years after termination of his or her employment, the Employee will not in any way be associated

-4-

with or involved, directly or indirectly, with any person, firm, corporation or other entity engaged in any business which provides services substantially similar to the services provided by the Employer or its Affiliates within the area known as Southeast Texas and Southwest Louisiana and any area located within the radius of 100 miles from Electro-Motor, Inc. or within the radius of 100 miles from any other office of the Employer, whether now operated by the Employer or hereafter operated by it;

(b)     **Non-Solicitation of Customers**   He or she will not, for a period of three (3) years after termination of his or her employment, directly or indirectly, approach any customer or business partner of the Employer or its Affiliates for the purpose of providing services substantially similar to the services provided by the Employer or its affiliates; and

(c)     **Non-Solicitation of Employees**   He or she will not, for a period of three (3) years after termination of his or her employment, directly or indirectly, approach, solicit, entice or attempt to approach, solicit or entice any of the other employees of the Employer or its Affiliates to leave the employment of the Employer.

In the 2000s, after the death of the company's founders and after responsibility for daily business operations had fallen upon their children and nephews, the company began to experience financial distress.  A considerable liability to the Internal Revenue Service accrued and the company experienced several equipment failures.  This eventually led to the filing of a voluntary petition for relief under Chapter 11 of the Bankruptcy Code for the benefit of EMI in January 2005.  As general manager during the pendency of the first bankruptcy case, Welborn testified that he endured an era of stormy customer relationships caused by the 2005 Chapter 11 filing.  He testified that his job had become

increasingly stressful as he sought to maintain customer confidence in EMI's viability and capacity to meet customer needs.   He became weary of "keeping a sinking ship afloat."

Though EMI confirmed a plan of reorganization in its 2005 case, its financial struggles continued through the next few years.  It seems apparent that Welborn was not consulted as senior management weighed its options about what to do regarding the ongoing financial problems.

On Friday, April 18, 2008, Welborn was informed by EMI's president, Joanne Welborn Ledger, that EMI had filed a second Chapter 11 petition on that day.  Clearly frustrated and infuriated about the decision, Welborn testified that he was not going to put himself through the same emotional turmoil and stress a second time.   He immediately called his brother, David, regarding employment at IAS.  He met with David and IAS' president, Gene Steadman, on Saturday, April 19 regarding employment opportunities.  In response to a specific question, Welborn told Steadman that he had no non-competition agreements with EMI.[5]

He returned to work at EMI on Monday, April 21 and on Tuesday, April 22. During those two days, he began a comprehensive backup of his files on his EMI computer[6] and then proceeded to forward a number of files to his home e-mail address. While Welborn claims that this was personal information, the evidence tendered at the

---

[5]  Welborn testified that he had simply forgotten about the September 2002 agreement.

[6]  The evidence indicates that such a backup by Welborn was not unusual, but in this instance, no copy of the backup was provided to EMI's president, Ms. Ledger, as per the usual procedure.

preliminary injunction hearing indicated that a substantial portion of the transmitted files and e-mail lists related to EMI, its customer base and customer information.[7]

On Wednesday, April 23, 2008, Welborn informed Ledger of his resignation and that he was "going to work at another shop." Without authorization, he took with him an EMI laptop computer, which provided him with access to EMI business information and which contained software necessary to access EMI's computer system from remote locations until such time that his user ID and password was revoked, and he apparently took a plastic bag full of business cards pertaining to EMI customer contacts which he had accumulated.[8] Much of the information taken was not readily available to anyone but EMI personnel.

At least by the beginning of the next week, Welborn had established an office at IAS. On Monday, April 28, 2008, utilizing the e-mail addresses that he had transferred from EMI's computer system, he forwarded an e-mail to a substantial number of EMI customers to inform them of his move to IAS. Though he made certain conciliatory statements about EMI and Ledger, the e-mail contained the following solicitation:

> I thank you for the opportunity of being able to service you in the past. My intentions (sic) is not to harm Electro-Motor in any fashion. My decisions was (sic) based off of what I needed to do to lower my stress level so I can continue to function in a fashion of offering my services to you in the best ability I can, regardless of where I am employed.

---

[7] Though much of the information clearly related to EMI's business, Welborn testified that he felt that "this was my information."

[8] Such assets were not returned to EMI until May 14.

I feel that IAS is where I need to be in order to service you the way you deserve. This company has a very knowledgeable group of individuals within it's (sic) management team who are working towards a common goal of customer satisfaction.

IAS has been planning an Open House for several months, here are the final dates, try to make time to drop by and see for yourself what the IAS team is all about. I think you will feel as I do after a first hand look and discussion with the key personell (sic), that this is a very positive situation for all involved.[9]

On May 2, 2008, EMI's bankruptcy counsel sent a letter to Welborn and two IAS entities demanding return of the EMI property and compliance with the terms of the confidentiality agreement and covenant not to compete. On May 8, 2008, EMI filed the complaint in this adversary proceeding for various forms of relief against Welborn, Industrial Apparatus Services, Inc., and Industrial Apparatus Services, Ltd., including injunctive relief.

At least as of time of the hearing to consider the entry of a temporary restraining order on May 15, 2008, Welborn had been terminated by IAS. On May 27, 2008, an agreed preliminary injunction was entered against the IAS defendants. On May 30, 2008, the Court conducted an evidentiary hearing regarding the entry of a preliminary injunction against Welborn to enforce the confidential agreement and the covenant not to compete pending a final trial on the merits of EMI's complaint.

---

[9] Ex. P-6 through P-9 (under seal).

-8-

## Injunction Standards

Courts within the Fifth Circuit look to the following criteria to determine whether a preliminary injunction should be issued:

(1) whether a substantial likelihood exists that the plaintiff will succeed on the merits;

(2) whether there is a substantial threat of irreparable injury if the injunction is not granted;

(3) whether the threatened injury to the movant outweighs the threatened injury to the respondent; and

(4) whether the granting of the preliminary injunction will disserve the public interest.

*Ridgely v. Fed. Emergency Mgmt. Agency*, 512 F.3d 727, 734 (5th Cir. 2008). Relief should be granted only if the party seeking relief has carried the burden of persuasion as to all four elements. *Dinovo v. Fed. Bureau of Prisons*, 2008 WL 859194 *1(E.D. Tex., Mar. 27, 2008).

## Discussion: Covenant Not to Compete and Non-Solicitation Covenant

*A.     Plaintiff's Likelihood of Success on the Merits.*

Generally speaking, a covenant not to compete is disfavored under Texas law as a restraint of trade. *Travel Masters, Inc. v. Star Tours, Inc.*, 827 S.W.2d 830, 832 (Tex. 1991). Such a covenant will be rendered unenforceable unless it complies with the statutory requirements set forth in §15.50 of the Texas Business and Commerce Code. That statute states, in relevant part:

Notwithstanding Section 15.05 of this code, and subject to any applicable provisions of subsection (b), a covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the good will or other business interest of the promisee.

TEX. BUS. & COMM. CODE ANN. §15.50(a) (Vernon Supp. 2007). The enforceability of a covenant not to compete, including the question of whether a covenant not to compete is a reasonable restraint of trade, is a question of law for the court. *Light v. Centel Cellular Co. of Texas*, 883 S.W.2d 642, 644 (Tex. 1994).

Though §15.50 and its accompanying provisions do not specifically mention enforcement of non-solicitation covenants, several Texas courts have subjected them to the same analysis as a covenant not to compete because of their similar purpose and effect. *See, e.g., Shoreline Gas, Inc. v. McGaughey*, 2008 WL 1747624, at *9 (Tex. App. – Corpus Christi, April 18, 2008, no pet.); *Miller Paper Co. v. Roberts Paper Co.*, 901 S.W.2d 593, 600 (Tex. App. – Amarillo 1995, no writ). Accordingly, the enforcement of the non-solicitation provision will be considered in conjunction with the covenant not to compete.

The first step in evaluating the validity of a covenant not to compete is to analyze whether there was an "otherwise enforceable agreement" between the parties. *Id*. This involves an examination of the corresponding promises (excluding the covenant not to

-10-

compete) made by each of the parties to the agreement.  This examination is particularly

crucial in an at-will employment environment because it is generally recognized under

Texas law that "non-compete clauses signed by at-will employees generally are

unenforceable if they are conditioned on continued employment, because such a promise

is illusory."  *Olander v. Compass Bank*, 172 F.Supp.2d 846, 851 (S.D. Tex. 2001).  "Any

promise made by either employer or employee that depends on an additional period of

employment is illusory because it is conditioned upon something that is exclusively within

the control of the promisor."  *Light*, 883 S.W.2d at 645, n. 5.   Thus, for there to be an

enforceable agreement to which a covenant not to compete can attach, it must be based

upon something other than the continued employment of the employee.

In the agreement at hand, Welborn made three particular promises to EMI: (1) he

would not disclose any confidential information to any non-employee; (2) he would not

use, take or reproduce any confidential information for any purpose other than to fulfill

his employment obligations with EMI; and (3) he would return all confidential

information and other company property to EMI upon cessation of his employment.

Conversely, however, it is difficult to identify in the agreement any bilateral promise

which EMI made to Welborn.  There is no express provision by which EMI directly

promised to provide confidential information to Welborn.  The agreement simply

acknowledged that Welborn will acquire confidential information of EMI and its

customers during his employment.[10]  Even if EMI had made such a bilateral promise, it

would almost certainly have been an illusory one since the agreement did not provide for

a definite term of employment or other benefits not tied to continued employment and

elementary contract law teaches us that an illusory promise is not a promise at all and

cannot constitute proper consideration for the formation of a bilateral contract.

RESTATEMENT (SECOND) OF CONTRACTS §77 (1981); *Rogers v. Alexander*, 244 S.W.3d

370, 382 (Tex. App. – Dallas 2007, no pet.).  ["An illusory promise is one that fails to

bind the promisor because he retains the option of discontinuing performance without

notice."].

It is virtually certain that, under the above circumstances, EMI could not have

enforced the covenant not to compete against Welborn prior to late 2006.  However, as a

result of the decision of the Supreme Court of Texas in *Alex Sheshunoff Mgmt. Serv.,*

*L.P., v. Johnson*, 209 S.W.3d 644 (Tex. 2006), that scenario has been reversed.  Under

*Sheshunoff*, an employee's promise not to disclose confidential information may create an

"otherwise enforceable agreement" when it is accepted by the employer's subsequent

performance of tendering confidential information to the employee, thus creating a

unilateral contract.[11]  It had been previously suggested by the Texas Supreme Court that

_____

[10]  The evidence is certainly sufficient to show that Welborn's position necessarily required access to confidential information.  While this might have constituted an implied promise by EMI to supply such confidential information to him in the future, the Court need not reach that issue nor whether such an implied bilateral promise was illusory as well.

[11]  In that circumstance, "the non-illusory promise can serve as an offer, which the promisor who made the illusory promise can accept by performance."  *Sheshunoff*, 209 S.W.3d at 650.

subsequent performance by the employer leading to the creation of a unilateral contract would be insufficient as a foundation for a covenant not to compete because §15.50(a) required that the creation of the enforceable agreement (the unilateral contract) and the covenant not to compete had to occur simultaneously, *see Light*, 883 S.W.3d at 645, n.6 ["But such unilateral contract, since it could be accepted only by future performance, could not support a covenant not to compete inasmuch as it was not an "otherwise enforceable agreement at the time the agreement is made" as required by §15.50."], and several Texas courts of appeal had so held based upon that very suggestion.  *See, e.g., Trilogy Software, Inc. v. Callidus Software, Inc*., 143 S.W.3d 452, 461 (Tex. App.– Austin 2004, pet. denied); *Tom James of Dallas, Inc. v. Cobb*, 109 S.W.3d 877, 886 (Tex. App. – Dallas 2003, no pet.); *Anderson Chem. Co. v. Green*, 66 S.W.3d 434, 438 (Tex. App. – Amarillo 2001, no pet.).  That line of authority would have likely tolled the death knell to enforcement of the non-compete covenant in this action since it is uncontested that EMI provided the confidential information not "at the time the agreement was made," but only at a subsequent time.[12]

However, the Texas Supreme Court in *Sheshunoff* construed §15.50 differently.  It ruled that the previous suggestion offered in *Light* was erroneous and that the clause "at the time the agreement is made" in §15.50(a) modifies "ancillary to or part of" and that,

---

[12] Nor could have Welborn's prior acquisition of confidential information have sufficed since past consideration could not properly serve as competent consideration for execution of the current agreements. *Trilogy Software*, 143 S.W.3d at 463.

instead of requiring the creation of the "otherwise enforceable agreement" and the covenant not to compete to be simultaneous, §15.50(a) requires only that the covenant be ancillary to the "otherwise enforceable agreement" whenever it is created.  As the Court stated, "We now conclude, contrary to *Light*, that the covenant need only be 'ancillary to or part of' the agreement at the time the agreement was made.  Accordingly, a unilateral contract formed when the employer performs a promise that was illusory when made can satisfy the requirements of the Act." *Sheshunoff,* 209 S.W.3d at 651.

The agreement executed by EMI and Welborn is substantially similar in all material respects to the contract considered in *Sheshunoff.*  The employment relationship between EMI and Welborn was at-will, and Welborn promised not to disclose EMI's confidential information.  That promise, which could not be legitimately accepted by a corresponding bilateral promise from EMI because the at-will employment status would have rendered it illusory, additionally constituted an offer for a unilateral contract which EMI could accept by performance.  That acceptance occurred when EMI subsequently tendered confidential information to Welborn and a unilateral contract was formed under which Welborn became bound by his promise not to disclose that information.  As recognized in *Sheshunoff*, that unilateral contract constitutes an "otherwise enforceable agreement" for the purposes of supporting an accompanying covenant not to compete under §15.50.

Welborn essentially claims that there could have been no acceptance of a unilateral

-14-

contract by EMI because he was never supplied with confidential information by EMI subsequent to the time of the agreement.[13]  The sealed evidence indicates otherwise.[14] Specific and comprehensive contact information for particular customers, specific pricing procedures which went beyond mere recitation of general information in general pricing treatises, special customer requirements and information, and the specific status of customer property, which was all contained on EMI's computer system, was surreptitiously appropriated by Welborn prior to his move to IAS.  A reasonable inference of its confidential nature can be drawn that Welborn knew of its strategic importance because he thought it imperative to insure access to that information prior to his move to IAS.  Though Welborn had been employed for a significant time, there is credible evidence that the nature of the confidential information which he downloaded from his EMI computer was acquired, supplemented or updated since September 2002.  Further, there is no evidence in the record that EMI ever authorized the release of this confidential

---

[13]  For the scope of confidential information, *see, e.g.*, *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003) [defining a trade secret as "any formula, pattern or device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors, who do not know or use it"].  "Items such as customer lists, pricing information, client information, customer preferences, buyer contacts ... have been shown to be trade secrets." *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc*., 965 S.W.2d 18, 22 (Tex. App. – Houston [1st Dist.] 1998, no pet.); *accord, Rugen v. Interactive Bus. Sys., Inc.*, 864 S.W.2d 548, 552 ( Tex. App. – Dallas 1993, no writ).  However, information generally known and readily available is not confidential.  "Consistent with this concept of secrecy, a former employee may use the general knowledge, skills, and experience acquired during employment to compete with a former employer." *Trilogy Software*, 143 S.W.3d at 467.  Thus, the protection ascribed to trade secrets does not automatically attach to any information a company obtains regarding its customers but rather is generally limited to that information which "is not generally known or readily ascertainable by independent investigation." *Rugen*, 864 S.W.2d at 552.

[14]  Ex. P-3 through P-5, P-17-18, P-22 (all under seal).

**-15-**

information to the public or to any competitor.  Thus, the evidence is sufficient to establish the confidential nature of the information held by EMI and appropriated by Welborn.

However, Welborn also claims that, even if the information might otherwise been construed as confidential, EMI is judicially estopped from making any claim regarding confidential information because no intellectual property or trade secrets were included on its original schedules.  That assertion is also without merit.  The Fifth Circuit has recognized that "judicial estoppel is invoked where intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice."  *In re Superior Crewboats, Inc*., 374 F.3d 330, 334-35 (5th Cir. 2004).  The Circuit recognizes three requirements to invoke its application: (1) the party is judicially estopped only if its position is clearly inconsistent with the previous one; (2) the court must have accepted the previous position; and (3) the non-disclosure must not have been inadvertent.  *Id*. at 335.  The Court notes that EMI filed for bankruptcy protection on April 18, 2008, and filed its original schedules on May 2.  Expedited hearings were conducted on various matters in the bankruptcy case.  On May 8, 2008, EMI filed this adversary proceeding against Welborn and the IAS entities and sought an emergency hearing for entry of a temporary restraining order.  The TRO hearing was conducted on May 15.  Expedited discovery was conducted thereafter prior to the May 30 preliminary injunction hearing.  Particularly in light of such expedited circumstances surrounding the

-16-

bankruptcy case and this adversary proceeding, Welborn has failed to demonstrate by probative evidence that he relied on such schedules in any way or that any court action occurred during that brief time period which evidences that the Court "accepted" the statements about trade secrets or other confidential information made in EMI's original schedules.  It does not appear that the omission of the existence of such information was anything but inadvertent.  Additionally, EMI moved expeditiously to amend its schedules prior to the preliminary injunction hearing when it learned of such omission.  This series of events demonstrates that EMI was not "playing fast and loose" with the Court and that the original omission of the EMI's trade secrets from its schedules should not preclude EMI from seeking to enforce its covenants with Welborn.

However, the existence of an enforceable agreement to maintain the confidentiality of EMI's information becomes immaterial to the enforcement of the covenant not to compete unless the covenant was "ancillary to or part of" the enforceable agreement. There are two elements to that requirement: "(1) the consideration given by the employer in the otherwise enforceable agreement must give rise to the employer's interest in restraining the employee from competing; and (2) the covenant must be designed to enforce the employee's consideration or return promise in the otherwise enforceable agreement."  *Sheshunoff,* 209 S.W.3d at 648-49.  In other words, the enforceable agreement must give rise to an "interest worthy of protection" by a covenant not to compete.  *Id*.

-17-

In this case, just as in *Sheshunoff,* the enforceable agreement was created by the employee's promise not to disclose the company's confidential information.  This unilateral contract to protect that information, once formed by the tendering of such information by EMI, certainly constitutes an interest worthy of protection through the covenant not to compete since the restraint enforced by the covenant relates directly to the subject matter of the enforceable agreement — the protection of confidential information. *DeSantis v. Wackenhut Corp*., 793 S.W.2d 670, 682 (Tex. 1990).   Thus, the covenant not to compete given by Welborn was "ancillary to or part of an otherwise enforceable agreement" as required by §15.50(a).  Accordingly, the Court concludes that there is a substantial likelihood that EMI will succeed on the merits of enforcing the covenant not to compete signed by Welborn.

B.      *Substantial Threat of Irreparable Injury*.

With regard to this element in the context of a covenant not to compete, Texas law provides that "proof that a highly trained employee is continuing to breach a non-competition covenant gives rise to a rebuttable presumption that the applicant is suffering irreparable injury." *Cardinal Health Staffing Network, Inc. v. Bowen*, 106 S.W.3d 230, 236 (Tex. App. – Houston [1st Dist.] 2003, no pet.).  EMI provided sufficient proof that Welborn engaged in activities constituting a breach of his covenant not to compete.  As cited earlier, there is significant evidence to indicate that Welborn moved confidential EMI information, including the status of EMI pending business, to his home and then to

-18-

IAS' computer system.[15]  He utilized EMI data to inform EMI clients of his move to IAS

and solicited their business to IAS.[16]  Within a week of employment at IAS, Welborn had

acquired business for IAS with a customer he had formerly serviced at EMI which

received an enthusiastic response from the president of IAS.[17]  Other evidence is

sufficient to create at least an inference that other customers of EMI moved their business

to IAS after Welborn's solicitation in a quantity far outside the normal course of

commerce.[18]  Therefore, the Court concludes that EMI has satisfactorily demonstrated a

prima facie case of irreparable injury.  Welborn failed to provide sufficient evidence to

rebut the presumption arising under Texas law.[19]  Accordingly, the second factor

governing the issuance of a preliminary injunction is satisfied.

C.      *Threatened Injury to Movant Outweighs Threatened Injury to Opponent.*

Though Welborn testified about his need for employment, and the personal

hardships occasioned by the entry of the temporary restraining order and the termination

of his employment by IAS, the evidence demonstrates rather conclusively that Welborn

has, and, without the protection occasioned by injunctive relief, will likely continue to

---

[15]  *See supra* note 14.

[16]  *See supra* note 9.

[17]  Ex. P-11 (under seal).

[18]  Ex. P-13 through P-15 (under seal).

[19]  In fact, Welborn's testimony supports an inference that he would be unable to answer for any monetary damages subsequently awarded at a trial on the merits.

-19-

take action which is detrimental to the interests of EMI in violation of the terms of the September 2002 agreement which he made with EMI. The Court has found that, at least for the purposes of this preliminary injunction determination, that the covenant not to compete is enforceable by EMI. Though one might legitimately feel sympathy for members of Welborn's family who perhaps will have to suffer the consequences of his decision to terminate his employment with EMI, his reliance upon future employment with IAS, and particularly his decision to immediately engage in activities which were clearly detrimental to EMI, the Court finds that the threatened injury to EMI (which was more than threatened, but rather immediately perpetrated by Welborn in the absence of injunctive restraint) and which is occurring as EMI again seeks to rehabilitate its business operations under the protection of this Court, outweighs any threatened injury to Welborn who should have reasonably anticipated the consequences of his voluntary decision to terminate his employment relationship with EMI.

D.    *Granting Will Not Disserve the Public Interest.*

The Court finds that the granting of the preliminary injunction in favor of EMI will not disserve the public interest. The Texas legislature has, in fact, articulated the public interest in this area by articulating in §15.50 the circumstances under which a covenant not to compete shall be enforceable in this state. Having found that EMI is otherwise entitled, as a matter of holding the status quo, to seek enforcement of that covenant under the standards prescribed by state statute, this standard is satisfied for the purpose of

issuing a preliminary injunction in recognition of that enforceable covenant not to compete.

E.    *Application to Non-Solicitation Covenant.*

In light of the foregoing analysis with respect to the covenant not to compete, including the compelling evidence that Welborn not only constituted a threat to solicit customers and employees to the detriment of EMI, but that he began efforts immediately after his voluntary departure from EMI to solicit EMI customers for the benefit of IAS,[20] the Court concludes that EMI has also presented the requisite proof to demonstrate its entitlement to injunctive relief to enforce the non-solicitation covenant pending a trial on the merits.

## Discussion: Non-Disclosure Provision

A.    *Plaintiff's Likelihood of Success on the Merits.*

Texas law establishes the fact that a non-disclosure agreement is more readily enforced than a covenant not to compete because a non-disclosure provision is not a restraint on trade. *Olander*, 172 F.Supp.2d at 852. Such a provision may be enforceable even when a corresponding covenant not to compete is unenforceable. *Tom James,* 109 S.W.3d at 888; *Anderson Chem.*, 66 S.W.3d at 439. As articulated earlier, there is credible evidence that Welborn had access to the EMI confidential information that he

---

[20]    *See supra* notes 9 and 17.

had downloaded from his EMI computer[21] and that he immediately began to solicit EMI customers for the benefit of IAS.[22]  Though Welborn repeats his claim that the information that he appropriated does not rise to the level of confidential information, that argument is again rejected because the EMI information over which he exercised dominion and control was a compilation of specific customer information regarding contacts, pricing, preferences and requirements which he deemed important immediately prior to his move to IAS and which was not generally known or readily ascertainable elsewhere.  Thus, there is a likelihood of success on the merits by EMI to show that unauthorized access to its confidential information by Welborn was, and would be, improperly utilized to its detriment.

B.      *Substantial Threat of Irreparable Injury.*

As outlined earlier, there is significant evidence in the record that establishes that Welborn violated the non-disclosure covenant in his brief tenure at IAS.  Welborn moved confidential EMI information to his home and to the IAS computer system.[23]  He utilized the EMI customer database and actually contacted specific customers from the EMI database regarding his move to IAS and that he directly solicited them to move their business to IAS.[24]  The evidence submitted clearly demonstrates that he was successful in

---

[21]  *See supra* note 14.

[22]  *See supra* notes 9 and 17.

[23]  *See supra* note 14.

[24]  *See supra* note 9.

those attempts.[25]  Such evidence creates more than a reasonable inference that Welborn would use EMI's confidential information to its detriment without the entry of injunctive relief.

Welborn claims that mere exposure to alleged confidential information "is not sufficient in and of itself" to create an inference that the employee has or will divulge that information to a subsequent employer.  The Court agrees.  However, EMI is relying upon more than a mere inference arising from exposure.  It tendered significant, credible evidence that it has already lost business as a result of Welborn's post-employment activities.  Thus, there is no reliance in this case on the doctrine of inevitable exposure.

EM has satisfactorily demonstrated that it will suffer irreparable injury without the entry of a preliminary injunction to enforce its non-disclosure covenant.  Therefore, the second factor governing the issuance of a preliminary injunction regarding the non-disclosure and non-solicitation covenants is satisfied.

C.      *Threatened Injury to Movant Outweighs Threatened Injury to Opponent.*

Welborn really made no evidentiary presentation which would demonstrate any threatened injury to him through the enforcement of the non-disclosure provision.  In light of the foregoing evidence presented by EMI, this element is satisfied by more than a preponderance of the tendered evidence with relation to the non-disclosure provision.

---

[25]  Ex. P-11 and P-13 through P-15 (under seal).

D.      *Granting Will Not Disserve the Public Interest.*

The Court finds that the granting of the preliminary injunction in favor of EMI on its non-disclosure covenant will not disserve the public interest.  Because such covenants do not constitute a restraint on trade and do not preclude an employee from using general knowledge that he has obtained from his prior work experience, they do not offend public policy.  *Olander*, 172 F.Supp.2d at 852.

## Conclusion

For the foregoing reasons, the Court concludes that, by a preponderance of the evidence, EMI has demonstrated that a preliminary injunction to enforce the covenants contained in the Confidentiality, Non-Competition and Non-Solicitation Agreement should be granted.

This memorandum of decision constitutes the Court's findings of fact and conclusions of law[26] pursuant to Fed. R. Civ. P. 52, as incorporated into adversary proceedings in bankruptcy cases by Fed. R. Bankr. P. 7052.  A separate order granting the preliminary injunction will be entered consistent with this opinion.

Signed on 06/20/2008

THE HONORABLE BILL PARKER
CHIEF UNITED STATES BANKRUPTCY JUDGE

---

[26]  To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such.  To the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such.  The Court reserves the right to make additional findings and conclusions as may be necessary.